## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Cameron Martin,

                Plaintiff,      Case No. 1:20-cv-04223

v.                          Michael L. Brown
                                United States District Judge

Hauser, Inc.,

                Defendant.

_____/

## OPINION & ORDER

Plaintiff Cameron Martin moves to remand this case to state court and seeks an award of attorneys' fees for improper removal. (Dkt. 7.) The Court grants Plaintiff's motion to remand but denies his request for attorneys' fees. Because the Court lacks subject matter jurisdiction over this action, the Court also denies as moot the other motions pending in this case: a joint motion to extend certain case deadlines (Dkt. 14) and Defendant's motion for reconsideration of a pre-removal order entered by the state court (Dkt. 9).

## I.     Background

Defendant Hauser, Inc. is an insurance brokerage firm.  (Dkt. 10-1 at 3.)   Plaintiff started working there in January 2014.  (*Id.*)  As a condition of his employment, Plaintiff signed an agreement containing three restrictive covenants.  (*Id.* at 5–6.)  The covenants essentially bar Plaintiff from (1) soliciting Defendant's customers; (2) inducing Defendant's customers, employees, or suppliers to terminate their association with Defendant; and (3) interfering with Defendant's relationship with its customers or employees.  (Dkt. 10-1 at 5–6, 21.)[1]

---

[1] The full text of the first covenant reads:

> Employee hereby agrees that upon termination of Employee's employment with Company, and for a period of three (3) years thereafter, Employee will not engage in any direct or indirect solicitation, whether such solicitation is initiated by Employee or some other party, of any customers or clients of Company who were customers or clients of Company at the time Employee's employment with Company terminates or at any time during the 18 months prior to such customer or client of Company to switch or move its insurance or other business to another company or agency during the aforementioned three (3) year period.

(Dkt. 10-1 at 5, 21.)  The full text of the other two covenants is below:

> During the period of Employee's employment with Company and for a period of three (3) years thereafter, Employee shall not directly or indirectly, on Employee's own behalf or on

Each covenant applies for three years after the termination of Plaintiff's employment with Defendant. (*Id.* at 5–6.)

On September 22, 2020, Plaintiff resigned from Defendant and (within a day or so) joined another insurance brokerage firm called Cobbs Allen Capital, LLC ("CAC"). (*Id.* at 4.) On September 24, 2020, Plaintiff sued Defendant in Georgia state court, seeking (1) a declaration that Defendant's restrictive covenants are unenforceable under Georgia law and (2) an injunction enjoining Defendant from enforcing the covenants against Plaintiff. (Dkt. 10-1.) On October 2, 2020, in *Ohio* state court, Defendant sued Plaintiff and sought a temporary restraining order

---

behalf of any other person, firm or company, without the consent of Company: (i) in any manner whatsoever induce, or assist others to induce, any employee, agent, representative or other person associated with Company or any of its affiliates or subsidiaries to terminate his association with any such entity, or in any manner interfere with the relationship between Company or any of its affiliates or subsidiaries and any such person; or (ii) in any manner whatsoever induce, or assist others to induce, any supplier or customer of Company or any of its affiliates or subsidiaries to terminate its association with Company or any of its affiliates or subsidiaries, or do anything, directly or indirectly, to interfere with the business relationship between Company or any of its affiliates or subsidiaries and any of its customers.

(Dkt. 10-1 at 5–6, 21.)

("TRO") requiring him to comply with the covenants.  (Dkt. 10-1 at 82–127.)  Later that day, in the Georgia action, Plaintiff moved for a TRO enjoining Defendant from attempting to enforce the covenants against him. (Dkt. 2.)  On October 8, 2020, the Georgia state court held a hearing and orally granted Plaintiff's TRO request.  (Dkt. 7-2 at 102–103.)  The court specifically enjoined Defendant from enforcing the covenants for 30 days, including in the Ohio action.  (*Id.* at 103, 107.)[2]

On October 13, 2020, Defendant removed the Georgia action to this Court based on diversity jurisdiction.  (Dkt. 1; *see also* Dkt. 10.)  Plaintiff immediately filed a motion to remand, claiming the amount in controversy does not exceed $75,000.  (Dkt. 7.)  The next day, Defendant filed a motion for reconsideration in which it asks the Court to vacate the TRO issued by the Georgia state court.  (Dkt. 9.)  On October 27, 2020, the parties filed a joint motion to extend (1) the response deadline for Defendant's motion for reconsideration and (2) the deadline by which Defendant may answer Plaintiff's complaint.  (Dkt. 14.)

---

[2] It appears the Ohio court has not yet ruled on Defendant's TRO motion. (*See* Dkts. 7-1 at 4 n.2; 13 at 2.)

## II.    Discussion

### A.    Legal Standard

Defendant says the Court has diversity jurisdiction over this action. (Dkt. 10 ¶ 2.)   Diversity jurisdiction exists where the amount in controversy exceeds $75,000 and the suit is between citizens of different states.   28 U.S.C § 1332(a).   There is no dispute that Plaintiff and Defendant are citizens of different states.   The only question is whether the amount in controversy exceeds $75,000.   That is a tricky question to answer as Plaintiff seeks only declaratory and injunctive relief, expressly stating he "does not seek any monetary damages."   (Dkt. 10-1 at 2.)

"When a plaintiff seeks injunctive or declaratory relief, the amount in controversy is the monetary value of the object of the litigation from the plaintiff's perspective." *Federated Mut. Ins. Co. v. McKinnon Motors, LLC*, 329 F.3d 805, 807 (11th Cir. 2003).   "In other words, the value of the requested injunctive relief is the monetary value of the benefit that would flow to the plaintiff if the injunction were granted."   *Morrison v. Allstate Indem. Co.*, 228 F.3d 1255, 1268 (11th Cir. 2000).[3]   In a

---

[3] Where a non-damages complaint seeks both declaratory and injunctive relief, courts often focus on the value of the latter because it effectively

restrictive covenants case like this one, the value of the injunctive relief is "measured by comparing what plaintiff[] could earn while complying with the restrictive covenants to what [he] could earn without having to comply." *Huff v. Alfa Ins. Corp.*, 2009 WL 10700493, at *4 (N.D. Ga. June 25, 2009) (Carnes, J.); *see Bell v. PSS World Med., Inc.*, 2013 WL 5555480, at *2 n.3 (N.D. Ga. Oct. 8, 2013) ("[T]he value of the litigation to the plaintiff is . . . the difference between what the plaintiff can earn with and without complying with restrictive covenants."). "[T]he removing defendant must prove by a preponderance of the evidence that [the difference between those two numbers] exceeds the jurisdictional requirement." *Williams v. Best Buy Co.*, 269 F.3d 1316, 1319 (11th Cir. 2001).

That is not an easy showing to make. "In light of the federalism and separation of powers concerns implicated by diversity jurisdiction, federal courts are obligated to strictly construe the statutory grant of diversity jurisdiction." *Morrison*, 228 F.3d at 1268. That means "where plaintiff and defendant clash about jurisdiction, uncertainties are

---

subsumes the value of the former. *See Samuels v. Mackell*, 401 U.S. 66, 72 (1971) ("[D]eclaratory relief alone has virtually the same practical impact as a formal injunction would.").

6

resolved in favor of remand." *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994); *see Gulf-to-Bay Anesthesiology Assocs., LLC v. UnitedHealthcare of Fla., Inc.*, 2018 WL 3640405, at *1 n.1 (M.D. Fla. July 20, 2018) ("When considering a motion to remand, the district court . . . construes all factual ambiguities in favor of the plaintiff."). It also means courts cannot consider "benefits resulting from an injunction" that are "too speculative and immeasurable to be included in determining the amount in controversy." *Morrison*, 228 F.3d at 1268–70; s*ee Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1077, 1079 (11th Cir. 2000) (injunctive relief "involve[d] too many contingencies" to satisfy the amount-in-controversy requirement); *Saville v. Lonesource, Inc.*, 2012 WL 13015092, at *3 (N.D. Ga. Feb. 9, 2012) ("[T]he benefit to Saville if granted the equitable relief he seeks hinges on a series of contingencies that cannot be reduced to a monetary standard, making it impossible to satisfy the amount in controversy."). Defendant must show *unambiguously* "that the benefit to be obtained from the injunction is sufficiently measurable and certain to satisfy the amount in controversy requirement." *Morrison*, 228 F.3d at 1269; *see Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1213 (11th Cir. 2007) (removing defendants must "unambiguously establish

federal jurisdiction").  In determining whether defendant has met this burden, the Court may consider the complaint, the notice of removal, and any record evidence bearing on the amount in controversy at the time of removal.  *See Williams*, 269 F.3d at 1319–20; *Huff*, 2009 WL 10700493, at *4.[4]

Defendant claims Plaintiff will lose more than $75,000 in compensation from CAC if he is required to comply with the restrictive covenants.  Defendant, however, fails to show what Plaintiff is slated to earn at CAC, let alone that enforcement of the restrictive covenants will reduce his compensation by more than $75,000.  The Court thus finds

---

[4] Defendants are not entitled to post-removal jurisdictional discovery because "[s]uch fishing expeditions would clog the federal judicial machinery, frustrating the limited nature of federal jurisdiction by encouraging defendants to remove, at best, prematurely, and at worst, in cases in which they will never be able to establish jurisdiction." *Lowery*, 483 F.3d at 1217.  A post-removal "request for [jurisdictional] discovery is [also] tantamount to an admission that the defendants do not have a factual basis for believing that jurisdiction exists," in violation of Rule 11 of the Federal Rules of Civil Procedure. *Id.*  "The natural consequence of such an admission is remand to state court." *Id.* at 1217–18; *see Hines Interests Ltd. P'ship v. Southstar Capital Grp. I, LLC*, 2018 WL 7460045, at *7 (M.D. Fla. Dec. 20, 2018) ("[J]urisdictional discovery must be conducted by the removing defendant prior to removal such that . . . the removing defendant can represent, subject to the requirements of Rule 11, that the federal court has diversity jurisdiction over the claims in the case.").

Defendant has not met its burden of showing the amount in controversy satisfies the Court's jurisdictional requirement.

### B.    Plaintiff's CAC Compensation is Unclear

Defendant lacks any credible information about what Plaintiff will earn through employment at CAC.  Defendant's only evidence is a draft email saved in Plaintiff's work mailbox during his employment with Defendant.  The key language from the email is below:

I was exploring alternative options 2nd half of last year.  Paused that bc of RAMS.

**Market Intel:**
- Harbut - $275k + 100k guarantee = $375k guarantee
- BC = "Offer" - $350-400k guarantee + sales commissions + long term incentive well in 7 figures
- CAC = $500k salary, day 1 equity, $300k forgivable loan – 3 years, 15% commission
- McGriff - $1.5M retention bonus

(Dkt. 10-4 ¶ 7.)   Defendant claims the third bullet point describes Plaintiff's current compensation package at CAC: an annual salary of $500,000, equity in the company, a $300,000 loan, and "15% commission."  But this conclusion is impermissibly speculative for several reasons.

First, Defendant has not provided the Court with a copy of the full email.  Instead, it submitted screenshots of excerpts from the email and a screenshot of the Microsoft Outlook preview window of the email. (Dkts. 10-3 at 4; 10-4 ¶ 7.)  The Court can only guess whether the full

email includes other relevant information that Defendant omitted, including information inconsistent with Defendant's argument here.

Second, the email was drafted several months ago and appears to rely on market information obtained from unidentified sources in 2019. (Dkts. 10-3 ¶¶ 6–7; 10-4 ¶ 6.)  It is unclear whether those historical numbers were ever accurate (since we do not know where they came from), much less whether they remain accurate today.

Third, even if the numbers hold true today, the Court has no idea what they actually mean.  They appear to describe compensation at CAC and three other companies based on "market intel" obtained by Plaintiff. But they could easily refer to compensation received by other employees, Plaintiff's supposition about his likely compensation, Plaintiff's compensation objectives, prior offers, or any number of other possibilities.  There is no evidence that CAC is actually paying Plaintiff the amounts described in the draft email.  The Court would have to rely on a chain of speculative assumptions to reach that conclusion.  It declines to do so, especially since Plaintiff "denies that this email accurately reflects his compensation at CAC."  (Dkt. 13 at 3 n.3.)

## C.   The   Covenants'   Impact   on   Plaintiff's   CAC Compensation is Speculative

Even if the Court could conclude the draft email establishes Plaintiff is slated to earn a salary of $500,000, equity in the company, a $300,000 loan, and 15% commission, that would not be enough to establish jurisdiction because Defendant has not shown Plaintiff will lose more than $75,000 if required to abide the covenants at issue. Defendant apparently assumes Plaintiff will lose his job at CAC — and thus his entire compensation package — if he is required to comply with the covenants. But, at this early stage of the litigation, there is insufficient evidence to support that conclusion. None of the covenants is an explicit non-compete clause that would preclude Plaintiff from working for CAC. (*See, e.g.*, Dkt. 9-1 at 18 ("Paragraph 6(b)(i) clearly is not a non-compete."), 21 ("[I]t is not reasonable to conclude that Paragraph 6(b)(ii) prohibits competition.").) One of the covenants precludes Plaintiff from soliciting Defendant's customers or clients for three years from the date of his departure. Another precludes him from taking any action for three years to induce employees, agents, representatives, customers, or suppliers to terminate their business relationships with Defendant. And the other precludes him, again for three years, from interfering with

Defendant's relationship with its customers or employees.  None of these covenants explicitly prevent Plaintiff from working with CAC.  There is thus no reason to think their enforcement would cost him his job entirely. And although Plaintiff has repeatedly said the covenants will harm his work at CAC, he has never said clearly — much less shown — it will prevent him from working there altogether or that it will cost his salary (or benefits) in excess of $75,000.  Indeed, Defendant argued in state court that Plaintiff is "free to continue working . . . however long he wants for any competitor" and that enforcing the covenants would not mean "he's going to be fired."  (Dkt. 7-2 at 84, 86; *see also* Dkt. 3 at 9 ("Hauser is not prohibiting [Plaintiff] from working nor does the Agreement restrain him from doing so.  Plaintiff has not shown that he would lose his position if the injunction was not granted.").)[5]

---

[5] To the extent the parties now dispute whether the covenants will functionally operate to preclude Plaintiff's employment at CAC, the current record is not clear enough to decide that issue one way or the other.  As a result, the Court must resolve the issue in favor of remand. *See Burns*, 31 F.3d at 1095 ("[U]ncertainties are resolved in favor of remand.").  Moreover, to the extent Defendant claims Plaintiff will lose more than $75,000 if the covenants reduce his CAC compensation by "even a small fraction," Defendant can only speculate about what that "fraction" might be.  (Dkt. 12 at 9.)  Absent any concrete evidence on which to quantify Plaintiff's future losses, the Court cannot just make up the numbers.

In its removal papers and brief in opposition to Plaintiff's motion to remand, Defendant cites a series of cases for the proposition that this Court and others have found evidence of an employee's proposed new salary in excess of $75,000 sufficient to "support diversity jurisdiction in restrictive covenant cases." (Dkts. 10 at 5; 12 at 10.) But enforcement of the restrictive covenants in those cases would have prevented the employees from working for their new employers, thus causing them to lose their entire salaries. *See Montgomery Kidney Specialists, LLP. v. Physicians Choice of Ala., LLC*, 2020 WL 570137, at *5–8 (M.D. Ala. Feb. 5, 2020) (considering enforcement of restrictive covenant that would preclude former medical directors from competing within certain territory and thus would prevent them from accepting positions worth more than $75,000); *Roberge v. Qualitek Int'l, Inc.*, 2002 WL 109360, at *2, 8 (N.D. Ill. Jan. 28, 2020) (considering enforcement of restrictive covenant that precluded former employee from engaging "in competition with [former employer] for a period of two (2) years" and would thus cost him salary in excess of $75,000); *Moorad v. Affordable Interior System.,  Inc.*, 2012 WL 162289, at *2–3 (N.D. Ga. Jan. 18, 2012) (considering enforcement of restrictive covenant that precluded employee from

13

working "in the business of office furniture manufacturing and . . . sales" and would thus prevent employee from continuing employment with salary in excess of 75,000); *Belnap v. Crenshaw Consulting Group, LP,* 2010 WL 11508716, at *2–3 (N.D. Ga. Mar. 15, 2010) (considering restrictive covenant that prevented former employee from competing "anywhere in the United States" for one year and thus would prevent employee from accepting position with salary in excess of $75,000); *CPI Qualified Plan Consultants, Inc. v. Barlow*, No. 2006 WL 269975, at *1 (D. Kan. Feb. 3, 2006) (former employer seeking to preclude employee from remaining in $80,000 per year position by enforcing restrictive covenant that included two-year covenant not to complete).  As explained above, that is not the case here.  The evidence, at this stage, does not show enforcement of the covenants will cause Plaintiff to lose his job entirely.  As a result, even if this Court were to assume CAC is paying Plaintiff more than $75,000, Defendant has not proved Plaintiff will lose the requisite amount from enforcement of the restrictive covenants.

Defendant posits another way of calculating the amount in controversy.  It claims Plaintiff will lose more than $75,000 in commission fees if the covenants are enforced against him because

(1) he managed "a book of business [for Defendant] that generated revenues significantly in excess of seven figures," (2) CAC would pay him a "15% commission" for those clients, and (3) the covenants preclude him from bringing those clients to CAC.  (Dkts. 5 ¶ 4; 12 at 8–9, 11–13.) Essentially, Defendant argues Plaintiff has the ability to earn more than $75,000 at CAC from stealing Defendant's clients such that preventing him from doing so by enforcement of the restrictive covenants would cost Plaintiff more than $75,000.  But even if the covenants are "voided and [Plaintiff] is allowed to contact his former clients, it is pure conjecture how many [of those clients] will switch" to Plaintiff's new firm.  *Saville*, 2012 WL 13015092, at *3; *see Crump Ins. Servs., Inc. v. All Risks, Ltd.*, 2010 WL 4810281, at *5 (N.D. Ga. Nov. 19, 2010) ("Notably absent, however, from any information presented to the court is whether the seventeen former clients have demonstrated any intent to move their business to Crump. . . .  [Plaintiffs] may or may not be able to attract the business of the seventeen customers identified.").  Will they all come? Will only some come?  Plaintiff presents no evidence of this.  And of any that do switch, the Court cannot assume they will generate the same revenue for CAC as they did for Defendant.  *See Cibula*, 2013 WL

5555445, at *3 (rejecting as "rank conjecture" the argument that "the volume of sales generated by the Four Customers, during the one-year effective period of the Restrictive Covenants, will be the same as the sales generated by these customers in 2012 for Defendants"); *see also Gallant v. CMGRP, Inc.*, 2016 WL 10920018, at *2 (N.D. Ga. Oct. 12, 2016) ("The Court cannot assume that Plaintiffs' benefit from allegedly soliciting two clients away from [defendant] can be measured solely by reference to [defendant's past] revenues from those clients.").[6]

It is also unclear how Plaintiff's purported commission is even calculated at CAC. All we have is a draft email that (assuming it accurately reflects Plaintiff's commission package) simply says

---

[6] Contrary to Defendant's assertion, nor can the Court assume Plaintiff will earn the same bonuses at CAC as he did at Defendant. (*See* Dkt. 5 ¶ 5); *Crump*, 2010 WL 4810281, at *3 ("[T]he relevant question is not what plaintiffs made while working for the former insurance company or what they were paid for their book of business."); *see also Cibula v. PSS World Med., Inc.*, 2013 WL 5555445, at *3 (N.D. Ga. Oct. 8, 2013) ("The Court also cannot assume, absent a record to support it, that Plaintiffs left their jobs with Defendants only to make the same or greater salary at a competitor."). Defendant also places undue weight on the state court's comment during the TRO hearing that Plaintiff "is at risk of . . . losing customer relationships" if the covenants are enforced. (Dkt. 7-2 at 104.) The Court views this comment — on which the state court did not elaborate — as entirely unremarkable. And the comment says nothing about how many customers will switch to CAC, much less *which* customers will do so or how much their business will be worth.

"15% commission" without any elaboration or explanation. The email does not identify the funds of which Plaintiff receives 15%. Nor does the email describe any other terms and conditions governing the commission scheme. The Court cannot calculate Plaintiff's allegedly lost commission fees without this information. Without any evidence about how Plaintiff's new commission arrangement works, what clients are likely to leave Defendant to work with Plaintiff at CAC, or how much they will likely spend at CAC, Defendant's contention that Plaintiff will earn more than $75,000 in commissions is nothing more than rank speculation. Defendant need not present this evidence with mathematical precision or even high a significantly high degree of probability, but simply saying that if customers leave to join Plaintiff at CAC he might earn more than $75,000 in commissions is not enough to establish the requisite amount in controversy.

Finally, Defendant claims Plaintiff is trying to recruit several of its employees, each of whom receives an annual salary of more than $75,000. (Dkt. 12 at 13–15.) This assertion, even assuming it is true, reveals nothing about the monetary benefit these employees would provide to

17

Plaintiff if they joined him at CAC.  It is thus irrelevant to the amount-in-controversy analysis.[7]

Given the evidence in this case, Defendant has not met its burden to prove the amount in controversy exceeds $75,000.  That precludes diversity jurisdiction.  As a result, the Court remands this action for lack of subject matter jurisdiction and denies as moot Defendant's motion for reconsideration and the parties' joint motion for an extension of case deadlines.

**D.   Attorneys' Fees**

Plaintiff also seeks attorneys' fees under 28 U.S.C. § 1447(c).  That provision says: "An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a

_____

[7] Defendant cites *McCoy v. Exhibitgroup/Giltspur, Inc.*, 2004 WL 1562858 (N.D. Tex. July 2, 2004) but that case is distinguishable because the plaintiff there *personally* hired his former co-workers to work for *him*. In contrast, Defendant here claims Plaintiff is soliciting employees to work for his new employer (CAC).  Moreover, even if *McCoy* was directly on point, it would not change the Court's conclusion.  It simply does not make sense to use employees' past compensation to value the benefit flowing to plaintiff from allowing him to recruit those employees to his new employer.  If *McCoy* does stand for that proposition, as Defendant claims, the Court finds it singularly unpersuasive and declines to follow it.  *McCoy* is not binding, it is not even in our circuit, and its conclusion appears in a single sentence without any substantive analysis or citation to authority.

18

result of the removal."   But "[a]ny award of attorneys' fees [under this language] is completely discretionary."   *Huff v. Alfa Ins. Corp.*, 2009 WL 10700493, at \*5; *see Graham Commercial Realty, Inc. v. Shamsi*, 75 F. Supp. 2d 1371, 1373 (N.D. Ga. 1998) ("An award of attorneys' fees is solely in the discretion of the court.").   The Court declines to award attorneys' fees here because Defendant's removal, while ultimately improper, was not clearly frivolous.   *See Martin v. Franklin Capital Corp.*, 546 U.S. 132, 136 (2005) ("Absent unusual circumstances, attorney's fees should not be awarded when the removing party has an objectively reasonable basis for removal.").

## III.   Conclusion

Plaintiff's Emergency Motion to Remand and for Attorneys' Fees (Dkt. 7) is **GRANTED IN PART** and **DENIED IN PART**.   It is granted to the extent it seeks remand, but denied to the extent it seeks attorneys' fees.   The Court **DIRECTS** the Clerk to remand this case to the Georgia State-wide Business Court.   The Court **DENIES AS MOOT** Defendant's Motion for Reconsideration (Dkt. 9) and the parties' Joint Motion for Extensions of Time (Dkt. 14).

**SO ORDERED** this 28th day of October, 2020.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE